J-S65016-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.M.H., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 830 EDA 2017 |

Appeal from the Decree February 1, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000750-2016,
CP-51-DP-0002809-2014

| | | |
|---|---|---|
| IN THE INTEREST OF: M.N.E.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 831 EDA 2017 |

Appeal from the Decree February 1, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000751-2016,
CP-51-DP-0002810-2014

| | | |
|---|---|---|
| IN THE INTEREST OF: M.M.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.H., FATHER | : | |
| | : | |
| | : | |
| | : | No. 833 EDA 2017 |

J-S65016-17

Appeal from the Decree February 1, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000752-2016,
CP-51-DP-0000897-2015

BEFORE: OLSON, J., OTT, J., and MUSMANNO, J.

MEMORANDUM BY OTT, J.:                        **FILED OCTOBER 27, 2017**

D.H. ("Father") appeals from the decrees entered on February 1, 2017, in the Philadelphia County Court of Common Pleas, involuntarily terminating his parental rights to his sons, D.M.H., Jr., born in February of 2012, and M.N.E.H., born in January of 2014, and his daughter, M.M.H., born in February of 2015 (collectively, "Children").[1]  Upon careful review, we affirm.

We summarize the factual and procedural history as follows.  The Philadelphia Department of Human Services ("DHS") became involved with this family in January of 2014, when Mother tested positive for illegal drugs at the time of M.N.E.H.'s birth.  Involuntary Termination Petition, 8/22/16, at Exhibit A, ¶ a.[2]  DHS established a safety plan whereby Mother, along with M.N.E.H. and D.M.H., Jr., were to reside in the home of her parents ("maternal grandparents"), who would supervise Mother's contact with her sons.  *Id.* at ¶ b.  In September of 2014, DHS received a report alleging that Mother and

_____

[1] By decrees entered on February 1, 2017, the trial court also involuntarily terminated the parental rights of the Children's mother, C.A.M. a/k/a C.M. ("Mother").  Mother did not file notices of appeal.

[2] During the subject proceedings, Mother's counsel stipulated to the statement of facts attached to DHS's petition.  N.T., 2/1/17, at 15.

M.N.E.H. were not residing with the maternal grandparents, but with Father, who also used drugs. *Id.* at ¶ c. Upon investigation, DHS substantiated the report. *Id.* Further, DHS found Father's home in disrepair and not appropriate for his sons. *Id.* at ¶ e.

On January 26, 2015, the trial court adjudicated D.M.H., Jr., and M.N.E.H. dependent. *Id.* at ¶ g. When M.M.H. was born in February of 2015, she tested positive for benzodiazepines. *Id.* at ¶ i. The trial court adjudicated her dependent on April 20, 2015. *Id.* at ¶ p.

The Children have special developmental and educational needs. N.T., 2/1/17, at 25. As a result, they receive cognitive therapy. *Id.* at 25-26, 38. In addition, M.M.H. receives physical therapy as a result of spinal problems. *Id.* at 39-40.

Father was assigned the following Single Case Plan ("SCP") objectives: report to the Clinical Evaluation Unit ("CEU") for three random drug tests and a drug screen assessment and diagnosis; participate in parenting classes; and participate in weekly supervised visits. N.T., 2/1/17, at 17-18.

In April of 2015, Father was incarcerated for one month due to a violation of probation, which he was serving as a result of a conviction in 2011 involving burglary. N.T., 2/1/17, at 62; DHS Exhibit 18. Thereafter, in June of 2015, Father was incarcerated for crimes committed after the placement of his sons involving robbery, unlawful restraint, and impersonating a public servant, to which he pleaded guilty. *Id.* at 63; DHS Exhibit 17. In February

of 2016, Father was sentenced to a term of incarceration of one to two years and five years of probation. Trial Court Opinion, 5/8/17, at 3; DHS Exhibit 17. In addition, in April of 2016, Father was sentenced to a term of incarceration of 3 to 24 months related to the 2011 crime of burglary. Trial Court Opinion, 5/8/17, at 3.

On August 22, 2016, DHS filed petitions for the involuntary termination of Father's parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). A hearing occurred on February 1, 2017, during which DHS presented the testimony of Kiyana Grimes, a social worker and case manager at the Community Umbrella Agency ("CUA"), and Tysha Fletcher, a CUA outcome specialist.[3] Father testified on his own behalf *via* telephone from State Correctional Institution ("SCI") Coal Township, at which time the parole board had approved a "home plan" for Father, but had not yet provided him a release date. N.T., 2/1/17, at 23, 34. In addition, Father presented the testimony of N.M. ("maternal grandmother"), who, along with the maternal grandfather, had been the kinship care providers for approximately one year at the time of the subject proceedings.[4] N.T., 2/1/17, at 114. The maternal

---

[3] In addition, DHS presented the testimony of Richard F. Limoges, M.D., psychiatrist, with respect to the involuntary termination petitions against Mother only.

[4] The maternal grandparents requested approval as kinship care providers at the time of the older children's placement. Involuntary Termination Petition, 8/22/16, at Exhibit A, at ¶ f. Although their request was not granted until

grandmother testified that Father occasionally telephones the Children from prison, and he sends them letters and pictures. *Id.* at 112-113.

By decrees dated and entered on February 1, 2017, the trial court involuntarily terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Father timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*.

On appeal, Father presents the following issues for our review:

A. Whether the trial court committed reversible error when it involuntarily terminated [F]ather's parental rights where such determination was not supported by clear and convincing evidence under . . . 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), and (a)(8) as [F]ather made progress towards working and meeting [his] [SCP] goals, namely staying drug free, working towards obtaining housing, working on parenting skills, and other goals, during the [C]hild[ren]'s placement?

B. Whether the trial court committed reversible error when it involuntarily terminated [F]ather's parental rights without giving primary consideration to the effect that the termination would have on the developmental[,] physical[,] and emotional needs of the [C]hild[ren] as required by the Adoption Act[,] 23 Pa.C.S.A. § 2511(b)?

Father's brief at 4.

We consider Father's issues according to the following standard.

_____

March of 2016, as best as we can discern from the certified record, the Children were placed with the maternal grandparents at the time of their adjudications "through a family arrangement . . . pending [their] kinship [care request]." N.T., 2/1/17, at 16, 25, 114; Involuntary Termination Petition, 8/22/16, at Exhibit A, at ¶ l.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. § 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, we

- 6 -

conclude that the certified record supports the decrees pursuant to Section 2511(a)(2) and (b), which provides as follows.[5]

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

---

[5] Based on this disposition, we need not consider Father's issues with respect to Section 2511(a)(1), (5), and (8).  However, we conclude that termination pursuant to Section 2511(a)(5) and (8) was not appropriate with respect to M.M.H. because she was never in Father's care.  Likewise, termination was not appropriate under these subsections with respect to D.M.H., Jr., because it is not clear in the certified record whether he was removed from Father's care.  **See In re C.S.**, 761 A.2d 1197, 1200, n. 5 (Pa. Super. 2000) (*en banc*) (holding that, because Section 2511(a)(5) and (8) are predicated on removal of the child from the care of the parent, they were inapplicable where the record reflects that the child was never in the father's care).

23 Pa.C.S. § 2511(a)(2), (b).

This Court has stated as follows.

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted)).

Further, we have stated, "[t]he grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). Nevertheless, parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *Id.* at 340. A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.*

In *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), our Supreme Court addressed the relevance of incarceration in termination decisions under Section 2511(a)(2). The *S.P.* Court held that "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued

incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied." *Id.* at 828.

With respect to Section 2511(b), this Court has stated that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

On appeal, Father argues that the court abused its discretion in terminating his parental rights pursuant to Section 2511(a)(2) because he attempted to remain close to the Children and to complete his SCP objectives. Specifically, Father asserts he "completed a drug program and was awaiting to be released from prison." Father's brief at 9 (citations to record omitted).

The trial court found that Father's conduct warranted termination under Section 2511(a)(2) as follows.

> Father has failed to take affirmative steps to place himself in a position to parent the Children. The Children need permanency,

which Father cannot provide. Father is unable to take immediate, or even foreseeable, custody of the Children and ensure that they receive their therapy and special services.

Trial Court Opinion, 5/8/17, at 11. Upon review, we discern no abuse of discretion.

Father testified that, at the time of the two older children's adjudication, he participated in a drug screen, which was positive for cocaine. N.T., 2/1/17, at 65. Kiyana Grimes, the CUA case manager for this family since February of 2015, testified that Father did not begin drug and alcohol services prior to his incarceration. *Id.* at 18. She testified that he completed a drug and alcohol program in prison in September of 2016. *Id.* at 20, 23.

With respect to his parenting objective, Ms. Grimes testified that, prior to his incarceration, Father was referred to the Achieving Reunification Center ("ARC") for parenting services, but he never attended. *Id.* at 49-50. Ms. Grimes testified that Father told her he was attending a parenting class at DHS, but he did not provide documentation to show he completed it. *Id.* at 50. In fact, Father acknowledged on cross-examination that he did not complete the parenting program before being incarcerated. *Id.* at 59-60. Further, Ms. Grimes testified she never received documentation to show that Father completed a parenting program while in prison. *Id.* at 20-21.

Ms. Grimes testified Father was granted weekly supervised visits with the Children before his incarceration. *Id.* at 19. She testified, "Sporadically,

[Father] would come to the visits. Normally he would engage and interact with the kids[,] but he [would] leave early." *Id.*

Ms. Grimes explained that the "home plan" approved by the parole board involved Father returning to the home of his sister, where he was residing at the time of the Children's placement. *Id.* at 34-35. Ms. Grimes testified on cross-examination that the home was not suitable for reunification purposes because it needed repairs and was too small to accommodate the Children.[6] *Id.*

Finally, Father testified during direct examination that he does not want his parental rights terminated "[b]ecause I want to be there. . . . I do have a relationship with my children. They do call me father. I want to be there. I'm willing to do whatever I have to do." *Id.* at 55-56. To the extent the trial court rejected Father's vow to cooperate as untimely or disingenuous, we discern no abuse of discretion. *See In re A.L.D.*, 797 A.2d at 340.

Indeed, prior to his incarceration, Father had not commenced drug and alcohol treatment. In addition, Father had not completed a parenting program, and he "sporadically" participated in supervised visits with the Children, from which "most of the time he would leave early." N.T., 2/1/17, at 19, 24. Father was incarcerated in June of 2015, through the time of the

---

[6] Ms. Grimes testified that the home of Father's sister would not accommodate the Children because it has two bedrooms, and an unspecified number of children of Father's sister reside there as well. N.T., 2/1/17, at 34.

- 11 -

subject proceedings, as a result of the crimes he committed after the placement of D.M.H., Jr. and M.N.E.H. Although the parole board had approved a "home plan" for Father, the home he would return to was not suitable for the Children. Moreover, Father would remain on probation for five years after his release, the date of which had not yet been determined at the time of the hearing.

Based on the foregoing, we discern no abuse of discretion by the trial court in terminating Father's parental rights pursuant to Section 2511(a)(2). Father's repeated and continued incapacity, neglect, or refusal to perform his parental duties has caused the Children to be without essential parental care, control or subsistence necessary for their physical or mental well-being. In addition, the causes of Father's incapacity, neglect, or refusal cannot or will not be remedied.

With respect to Section 2511(b), Father asserts that the Children "call him father and that he loves his children. . . ." Father's brief at 11 (*citing* N.T., 2/1/17, at 55-56). Therefore, Father argues DHS did not prove by clear and convincing evidence that a bond does not exist between him and the Children.

It is well-established that a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. ***See In re L.M.***, 923 A.2d at 512. Further, in considering the affection which a child may have for his or her natural parents, this Court has stated the following:

> Once clear and convincing evidence is produced demonstrating a parent has failed to cultivate a bond with her children, we cannot then overturn the termination of her parental rights on the basis that an agency did not produce enough evidence to prove the children do not feel strongly about the parent--a showing which is inherently negative in the first instance. A child's feelings toward a parent are relevant to the section 2511(b) analysis. Nonetheless, concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

In addition, our Supreme Court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, *supra* at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed that, "[c]hildren are young for a scant number of years, and we have

an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

In this case, there is no record evidence that the Children have seen Father since his incarceration in June of 2015. However, the maternal grandmother testified that Father telephones the Children from prison occasionally. N.T., 2/1/17, at 112. She explained, "Sometimes he will call every day for about a month[,] and then I may not hear from him maybe for a couple of weeks." *Id.* at 114. The maternal grandmother testified that D.M.H., Jr., and M.N.E.H. know who Father is. *Id.* at 112. With respect to M.M.H., she testified, "she knows daddy but I'm not sure that she could put a face to that. But she knows it's daddy on the phone." *Id.* at 113. The maternal grandmother testified that the Children "get very excited to speak with [Father] on the phone." *Id.*

Nonetheless, Ms. Grimes, a social worker and the case manager who visits the Children in their kinship care home on a regular basis, testified that D.M.H., Jr., then nearly age five, and M.N.E.H., then age three, "have a lack of connection with" Father because they have not "had any consistent contact or communication with" him. N.T., 2/1/17, at 25, 27-28. With respect to M.M.H., then nearly age two, Ms. Grimes testified that she "was an infant when . . . [Father] . . . was incarcerated so she really doesn't have any connection with him." *Id.* at 28. Therefore, Ms. Grimes testified that the Children would not suffer irreparable harm if Father's parental rights are

terminated. *Id.* at 29-30. Rather, Ms. Grimes testified that D.M.H., Jr., and M.N.E.H. are "well-bonded" to their maternal grandparents. *Id.* at 25. She testified that M.M.H. "is also attached" to the maternal grandmother. *Id.* Likewise, Tysha Fletcher, the CUA outcome specialist for this family since 2016, testified that there is "a big bond" between the Children and the maternal grandmother.[7] *Id.* at 107.

The maternal grandparents are a pre-adoptive resource for the Children. *Id.* 114. The maternal grandmother testified as follows on cross-examination by DHS:

> Q. [I]f the court were to terminate [Father's] rights, would you let him maintain contact or play any role in [the Children's] lives?
>
> A. Yes.

*Id.*

Finally, the maternal grandmother testified that D.M.H., Jr., and M.N.E.H. receive occupational therapy and special instruction in her home. *Id.* at 115. With respect to D.M.H., Jr., she testified, "He's doing wonderfully[,] so he's come a long way." *Id.* at 115. In addition, the maternal grandmother testified that M.M.H. receives special instruction and physical

---

[7] Ms. Fletcher testified that, while the maternal grandparents' kinship request was pending, she supervised visits between the Children and the maternal grandmother. N.T., 2/1/17, at 104-105. In addition, Ms. Fletcher testified that she supervised visits between the Children and Mother, and that the maternal grandmother attended those visits as well. *Id.* at 104-105, 108-109.

therapy. *Id.* Further, she testified that M.M.H. will begin speech therapy the following day. *Id.*

Based on the totality of the record evidence, which we have reviewed in light of the relevant statutory and case law, we discern no abuse of discretion by the trial court in concluding that there is no parental bond between the Children and Father; therefore, terminating Father's parental rights would not destroy an existing beneficial relationship for the Children. *See* Trial Court Opinion, 5/8/17, at 16. The testimonial evidence supports the court's conclusion that terminating Father's parental rights will serve the Children's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b). Accordingly, we affirm the decrees.

Decrees affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/27/2017